**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VERZELL JAMES, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 20-cv-00551 |
| v. | ) ) | |
| | ) | Judge Andrea R. Wood |
| CITY OF EVANSTON, et al., | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Verzell James resides at a property he owns in the City of Evanston, Illinois. In early 2018, Evanston passed an ordinance that granted a zoning exemption to the Morton Grove-Niles Water Commission ("Commission") allowing it to construct a water pumping station at a property neighboring James's home. James claims that Evanston and the Commission (together, "Defendants") sought to avoid public scrutiny of their plans to construct the water pumping station and therefore declined to abide by proper zoning procedures in obtaining approval of the project. Alleging that Defendants pursued this course of action because the affected community was predominantly African-American, James filed the present putative class action. Defendants have filed separate motions to dismiss (Dkt. Nos. 22, 23), along with a joint motion to strike class allegations (Dkt. No. 20). For the reasons that follow, Defendants' motions to dismiss are granted and their motion to strike class allegations is denied as moot.

## BACKGROUND

For the purposes of the motions to dismiss and the motion to strike, the Court accepts all well-pleaded facts in the complaint as true and views those facts in the light most favorable to James as the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th

Cir. 2007); *Tex. Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, No. 20-cv-0227, 2021 WL 780719, at *1 (N.D. Ill. Mar. 1, 2021). The complaint alleges as follows.

In February 2017, the Evanston City Council adopted an ordinance approving a Water Supply Agreement under which Evanston would supply water to the Villages of Morton Grove and Niles ("Villages"). (Compl. ¶ 8, Dkt. No. 1.) To effectuate the Water Supply Agreement, the Villages sought to construct a Morton Grove-Niles Water System ("System"). (*Id.* ¶ 9.) The Villages established the Commission in March 2017 to design, construct, finance, and operate the System. (*Id.* ¶ 10.)

One key component of the System was to be an intermediate water pumping station ("IPS") to aid in pumping water from Lake Michigan to the Villages. (*Id.* ¶¶ 1, 12.) Originally, the Commission selected a parcel of land in the Village of Skokie owned by the Metropolitan Water Reclamation District ("MWRD") as the site for the IPS. (*Id.* ¶ 12.) According to the most recent U.S. Census Bureau Data, the residents of the two census blocks closest to the proposed Skokie site were between 66% and 76% white. (*Id.* ¶ 15.) The Commission applied to the MWRD for an easement for the construction of the IPS at the Skokie location in December 2017. (*Id.* ¶ 12.) Around the same time, the Commission applied to Skokie for a special use permit. (*Id.* ¶ 13.) Skokie's process for applying for a special use permit required the Commission to provide at least 15-days' notice to all individuals residing within 250 feet of the proposed IPS site that the Commission would be appearing before the Skokie Plan Commission to obtain a special use permit for construction of the IPS. (*Id.* ¶ 14.) In compliance with this requirement, the Commission notified about 45 residents who lived within 250 feet of the proposed Skokie site of the public hearing on the Commission's petition for a special use permit scheduled for December 20, 2017, and published a public notice of the hearing. (*Id.* ¶ 16.) At the December 20 public

hearing, Skokie removed the Commission's petition from its Plan Commission's agenda after it became clear that the MWRD would not grant the Commission the authorization necessary for it to petition Skokie for zoning relief with respect to a property that the MWRD owned. (*Id.* ¶ 17.)

After the proposed Skokie site fell through, the Commission began looking to construct the IPS in Evanston. (*Id.* ¶ 18.) It obtained a contract to construct the IPS at one location in Evanston but declined to move forward with construction there. (*Id.*) On January 8, 2018, the Evanston City Council passed an ordinance authorizing Evanston to lease from the MWRD the property located at 2525 Church Street "for recreational uses." (*Id.* ¶ 19.) Yet at the same time it passed the ordinance, Evanston was aware that the Commission sought to locate the IPS at 2525 Church Street. (*Id.* ¶ 20.) The 2525 Church Street property is located in Evanston's Fifth Ward and, according to the most recent U.S. Census Bureau data, residents in four of the five census blocks closest to the property are between 82% and 92% African-American. (*Id.* ¶ 21.) Residents in the remaining census block are 34.5% African-American, 44.8% Hispanic, and 20.7% white. (*Id.*) James is among the African-American residents of the Fifth Ward, and he resides at a property he owns located in the immediate area of the 2525 Church Street property. (*Id.* ¶¶ 5, 44, 48–49.)

On January 11, 2018, the Fifth Ward Alderman sent a newsletter that included an agenda for the Fifth Ward meeting scheduled for January 18, 2018. (*Id.* ¶ 22.) One of the items listed on the agenda was "Niles Morton Grove Water Pumping Station Proposals," although neither the newsletter nor the agenda included any further information about the IPS or proposed site locations. (*Id.*) Around this time, discussions were underway between the Commission and Evanston regarding the construction of the IPS. (*Id.* ¶ 23.) On January 30, 2018, Evanston's City Manager sent an MWRD representative a letter expressing support for the construction of the IPS

at 2525 Church Street. (*Id.* ¶ 24.) Included with the letter was an attachment stating that a copy of the letter had been sent to 14 residents in the immediate area of the proposed site, including James. (*Id.*) But neither James nor any other resident named in the attachment received a copy of the City Manager's letter. (*Id.*)

As a property zoned as an "Open Space," there were very few permitted or special uses allowed at 2525 Church Street and a water pumping station was not among them. (*Id.* ¶ 25.) Under Evanston's Zoning Code of Ordinances ("Zoning Code"), however, a property owner, lessee, or other person with a legal or equitable interest in the property may obtain a "unique use" permit, granting them permission for a use not listed as an authorized special or permitted use within a particular zoning district, so long as the use "would be of substantial . . . economic benefit to the City." (*Id.* ¶ 26 (quoting Zoning Code § 6-3-7-1)[1].) The unique use application process requires Evanston's Plan Commission to hold a public hearing on the application and to give public notice of the hearing. (*Id.* ¶ 27.) In addition, Evanston is required to mail notice of the public hearing to all property owners within 1000 feet of the property lines in each direction of the subject property and to post a sign with notice of the hearing on the subject property at least 10 business days prior to the hearing. (*Id.* ¶ 28.) Property owners within 1000 feet of the subject property also have the right to inspect all documents submitted as part of the unique use application and to present witnesses on their behalf. (*Id.* ¶ 29.)

Instead of seeking a unique use permit for the IPS, the Commission instead agreed with Evanston to obtain a municipal use exemption. (*Id.* ¶ 30.) Under the Zoning Code's municipal use exemption:

---

[1] Evanston's Zoning Code is found in Title 6 of Evanston's Code of Ordinances. Citations are made to the version of the Code of Ordinances enacted on January 8, 2018 (Supplement 13, Update 2), as that was the version in effect at all times relevant here.

> Any governmental or proprietary function owned or operated by the City shall be a permitted use in any district. The City Council may approve buildings and structures owned and operated by the City that do not comply with all of the requirements of the underlying district, if they are necessary for the provision of desired City services and if the adverse impact on surrounding properties resulting from such noncompliance is minimized. Adverse impacts may be minimized by design, architectural treatment, screening, landscaping and/or placement on the lot. Such plan for reduction of adverse impact shall be subject to review by the Design and Project Review Committee.

Zoning Code § 6-7-4. The process for obtaining a municipal use exemption did not require specific notice to property owners and did not allow property owners to raise objections to the use. (Compl. ¶ 30.)

On February 12, 2018, Evanston's Administration and Public Works Committee and Planning and Development Committee each held separate meetings to consider the Commission's plan to construct the IPS at 2525 Church Street. (*Id.* ¶¶ 34–35.) Both committees unanimously adopted resolutions authorizing the construction of the IPS. (*Id.*) The same day, following the conclusion of each committee's meeting, the Evanston City Council met and approved resolutions authorizing the Commission to construct and operate the IPS at 2525 Church Street and granting it a municipal use exemption for that purpose. (*Id.* ¶¶ 36–37.) The City Council heard no public comment regarding those resolutions. (*Id.* ¶ 36.)

One day later, the Fifth Ward Alderman and a Commission representative attended a meeting of an informal organization of residents living in the vicinity of 2525 Church Street, where they informed attendees of the plans for construction of the IPS. (*Id.* ¶ 40.) For James and most of the attendees of the meeting, this was the first time they were made aware of the plan to construct the IPS at 2525 Church Street. (*Id.*) Yet they were told that it was too late to take any action to halt its construction in light of the Evanston City Council's vote the previous night. (*Id.*) Nonetheless, James filed an appeal with Evanston's Zoning Board of Appeals on March 8, 2018,

challenging the municipal use exemption. (*Id.* ¶ 43.) Subsequently, James was advised by Evanston's Law Department that he did not have a means to appeal the City Council's authorization of the municipal use exemption. (*Id.*) Despite James and other residents' concerns about the impact of the noise and vibrations from the IPS station on their health, they were left without recourse to challenge the construction of the IPS. (*Id.* ¶ 44.) Thus, construction moved forward on the project. (*Id.* ¶ 45.)

According to James, IPS construction activities caused damage such as cracks in the ceiling and walls to his home and to the homes of other residents in the immediate vicinity of 2525 Church Street. (*Id.*) James also contends that the value of properties neighboring the IPS has been harmed due to the loss of open and green space that previously existed at 2525 Church Street and for which the property was zoned. (*Id.* ¶ 47.)

Based on the circumstances leading up to the construction of the IPS, James has brought the present class action against the Commission and Evanston. He claims that Defendants conspired to construct the IPS in the predominantly African-American neighborhood surrounding 2525 Church Street while avoiding as much public scrutiny as possible. (*Id.* ¶ 1.) To achieve this end, Defendants worked together to allow the Commission to obtain a municipal use exemption for the IPS and avoid the process for acquiring a unique use permit and its attendant public notice and hearing procedures. (*Id.*) James contends that Defendants' conduct deprived him and similarly situated residents of the opportunity to challenge the construction of the IPS in their neighborhood. (*Id.*)

James's complaint contains five counts asserting claims on behalf of himself and either a proposed class of all residents living within 1000 feet of the 2525 Church Street property or a proposed subclass of all African-American residents living within 1000 feet of that property. In

Count I, James asserts a claim under 42 U.S.C. § 1985(3), alleging that Defendants conspired to deprive him and the proposed class of their rights to equal protection of the law by working together to wrongfully obtain a municipal use exemption for the IPS because the affected residents were African-American or lived in close proximity and associated with African Americans. Count II asserts claims against each Defendant under 42 U.S.C. § 1982 for violating James's and the proposed subclass members' rights to hold property on an equal basis with white persons. Counts III and IV assert claims against Evanston under 42 U.S.C. § 1983 for depriving James and the proposed class members of their procedural and substantive due process rights. Finally, Count V sets forth a claim against Defendants for discriminating against James and the proposed subclass in violation of the Illinois Civil Rights Act, 740 ILCS 23/5.

## DISCUSSION

Each Defendant has separately moved to dismiss James's complaint and jointly moved to strike his class allegations. Both Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) and Evanston also seeks dismissal under Rule 12(b)(1). Because Defendants' motions to dismiss, taken together, challenge all claims set forth in James's complaint, if they are granted in their entireties, the motion to strike class allegations will be moot. Thus, the Court begins by addressing the motions to dismiss.

### I.     Ripeness

Evanston has moved under Rule 12(b)(1) to dismiss James's entire complaint, arguing that this Court lacks jurisdiction due to James's failure to exhaust the state-law remedies available to address his alleged constitutional deprivations. Defendants base this supposed exhaustion requirement on the Supreme Court's decision in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985), which held that a claim

under the Fifth Amendment's Takings Clause generally is not ripe until the property owner has exhausted all available state-law remedies for compensation. The Seventh Circuit subsequently found that a property owner could not avoid *Williamson County*'s ripeness requirement "by applying the label 'substantive due process' to the claim. So too with the label 'procedural due process.' Labels do not matter. A person contending that state or local regulation of the use of land has gone overboard must repair to state court." *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (7th Cir. 1994). Of course, *Williamson County* was overruled by *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). However, Evanston insists that *Knick* overruled *Williamson County* only with respect to Fifth Amendment takings claims and did nothing to disturb the Seventh Circuit's extension of the ripeness requirement to Fourteenth Amendment due process claims.[2]

Before *Williamson County* was overruled, the Seventh Circuit described it as creating "a takings-claim exception to [the] general requirement that exhaustion is not required in § 1983 suits." *Daniels v. Area Plan Comm'n*, 306 F.3d 445, 453 (7th Cir. 2002). Indeed, just a few years before its *Williamson County* decision, the Supreme Court held that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982). Despite this seemingly categorical

---

[2] While Evanston contends that this Court lacks jurisdiction over James's purportedly unripe claims, the Seventh Circuit clarified just before *Williamson County* was overruled that the case had "nothing to do with subject-matter jurisdiction." *Kolton v. Frerichs*, 869 F.3d 532, 533 (7th Cir. 2017). At the same time, it recognized that courts, including the Seventh Circuit, had characterized *Williamson County* as about jurisdiction, surmising that "[t]his may reflect a bygone practice of using the term 'jurisdiction' loosely to refer to all obstacles to decision on the merits." *Id.* at 534. Despite its criticism, the Seventh Circuit did not go on to address whether a *Williamson County* ripeness challenge should be brought under a rule other than Rule 12(b)(1). Moreover, in a case decided after *Kolton*, the Seventh Circuit stated that the "ripeness doctrine arises out of the Constitution's case-or-controversy requirement," *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 676 (7th Cir. 2019), suggesting that Rule 12(b)(1) remains the proper procedural route to raise a ripeness challenge. *See also Harer v. Casey*, 962 F.3d 299, 306 (7th Cir. 2020) ("[R]ipeness implicates the district court's subject-matter jurisdiction under Article III of the Constitution . . . .").

rule, the Supreme Court found in *Williamson County* that *Patsy* did not preclude requiring administrative exhaustion for takings claims because "no constitutional violation occurs until just compensation has been denied." *Williamson Cnty.*, 473 U.S. at 194 n.13. In *Knick*, however, the Supreme Court repudiated *Williamson County*'s understanding of the Takings Clause, holding that a property owner has a takings claim "as soon as a government takes his property for public use without paying for it . . . . regardless of post-taking remedies that may be available." *Knick*, 139 S. Ct. at 2170.

In *Knick*, the Supreme Court expressed the view that *Williamson County*'s ripeness requirement "relegates the Takings Clause to the status of a poor relation among the provisions of the Bill of Rights," as "[p]laintiffs asserting any other constitutional claim are guaranteed a federal forum under § 1983" whereas authority over takings claims was handed to state courts. *Knick*, 139 S. Ct. at 2169–70. By overturning *Williamson County*, the Supreme Court in *Knick* meant to ensure that "[t]akings claims against local governments [are] handled the same as other claims under the Bill of Rights." *Id.* at 2177. The import of *Knick* is clear—failure to exhaust state remedies does not preclude a plaintiff from bringing a § 1983 claim, regardless of the constitutional violation alleged; *Williamson County*'s ripeness requirement for takings claims was an aberration that *Knick* found necessary to eliminate. Any extension of that aberration to non-takings claims necessarily fails.

When the Seventh Circuit applied the ripeness requirement to procedural and substantive due process claims, it did so to prevent plaintiffs with takings claims from avoiding the exhaustion requirement. Thus, where the challenged government action gave rise to a takings claim subject to exhaustion in state court, the Seventh Circuit required that any other constitutional claims arising from that action be exhausted in state court as well. *See Gamble v.*

*Eau Claire County*, 5 F.3d 285, 287 (7th Cir. 1993) ("*Williamson* holds that even if a taking can be challenged as a denial of substantive due process, a suit based on this theory is premature if the plaintiff has possible state remedies against the zoning regulation or other state action that he wants to attack."). With takings claims now no longer subject to the exhaustion requirement, the Seventh Circuit's rationale for requiring exhaustion for procedural and substantive due process claims challenging state or local land use regulations has evaporated. Moreover, maintaining the administrative exhaustion requirement would be directly contrary to the Supreme Court's stated purpose in *Knick* of ensuring that all constitutional claims brought under § 1983 be treated the same.

Finally, Evanston argues that *Knick* specifically distinguished takings claims from due process claims. It points to a portion of the *Knick* opinion criticizing *Williamson County*'s reliance on *Parratt v. Taylor*, 451 U.S. 527 (1981). *See Knick*, 139 S. Ct. at 2174. But *Parratt* is understood to stand for the proposition that "a claim under § 1983 for deprivation of property without prior notice and an opportunity for hearing fails where the property deprivation is the result of random and unauthorized acts by state officials and where a meaningful post-deprivation remedy is available." *Brunson v. Murray*, 843 F.3d 698, 715 (7th Cir. 2016). For present purposes, it suffices to say that *Parratt* concerns the viability of a due process claim and has nothing to do with ripeness for determination. *See Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003) ("The whole idea of a procedural due process claim is that the plaintiff is suing because the state failed to provide adequate remedies. We do not require a plaintiff to pursue [state] remedies in order to challenge their adequacy, but likewise we do not allow a plaintiff to claim that she was denied due process just because she chose not to pursue remedies that were adequate."). Thus, James's failure to exhaust state remedies goes to the merits

of his procedural due process claim and does not furnish a basis for dismissal on ripeness grounds. Evanston's Rule 12(b)(1) motion is therefore denied.

## II. Federal Claims

Together, Defendants' Rule 12(b)(6) motions seek dismissal of all claims brought against them under 42 U.S.C. §§ 1982, 1983, and 1985(3). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

### A. Applicability of Municipal Use Exemption

Each of James's federal claims is predicated on Defendants' decision wrongfully to obtain a municipal use exemption for the IPS rather than properly applying for a unique use permit, which would have entailed holding a public hearing on the application and providing the public sufficient notice of that hearing. The gist of each claim is that Defendants used an inapplicable provision of the Zoning Code to deprive the public of the opportunity to challenge the construction of the IPS at 2525 Church Street and did so because the affected community was predominantly African-American. By contrast, when the Commission tried to construct the IPS in a predominantly white community in Skokie, it sought a special use permit and provided the public with all notice that was due. Defendants, on the other hand, contend that their decision to obtain a municipal use exemption was permissible under the Zoning Code.

11

James's complaint alleges that a municipal exemption may be granted for "'buildings and structures owned and operated by the City' as long as the buildings or structures granted the exemption are 'necessary for the provision of desired City services.'" (Compl. ¶ 31 (quoting Zoning Code § 6-7-4).) He claims that because the IPS was not owned or operated by Evanston and was not necessary for the provision of any City service, it did not qualify for a municipal use exemption. But as Defendants point out, James's complaint selectively quotes from the applicable provision of the Zoning Code. The entire provision is set out in a single paragraph consisting of four sentences. James quotes from the second sentence, which Defendants contend applies to buildings and structures. Defendants argue that the applicable portion of the municipal use exemption actually appears in the first sentence, which provides that "[a]ny governmental or proprietary function owned or operated by the City shall be a permitted use in any district." (*Id.*) That sentence governs uses. According to Defendants, because providing and pumping water to the Villages is a proprietary function operated by Evanston, the municipal use exemption applies on its face.

While James disagrees that Defendants need only show that the IPS was a proprietary function operated by Evanston to qualify for a municipal use exemption, he insists that the Court need not reach that issue. First, he claims that Evanston's sale of water to the Villages is not a proprietary function. However, the Illinois Supreme Court has long recognized that a "municipal corporation selling . . . water . . . for private consumption does so in its proprietary rather than governmental capacity." *City of Chicago v. Ames*, 7 N.E.2d 294, 296 (Ill. 1937); *see also Baltis v. Village of Westchester*, 121 N.E.2d 495, 500 (Ill. 1954) ("[A] municipal corporation owning and operating a water system and selling water to individuals, although engaged in a public service, does so in its business or proprietary capacity . . . ."). According to James, those cases are

12

distinguishable because they involved a municipality selling water to its own residents, whereas here, Evanston is making sales exclusively to residents of the Villages. But there is no basis to treat sales to residents differently from sales to non-residents. Indeed, such an understanding is not supported by the common understanding of the meaning of "proprietary function." For example, Black's Law Dictionary defines the phrase to mean: "A municipality's conduct that is performed for the profit or benefit of the municipality, rather than for the benefit of the general public." Black's Law Dictionary (11th ed. 2019). Certainly, a municipality earns a profit or benefit from selling water to non-residents just as it does from sales to residents. Moreover, the Illinois Supreme Court has held that "[n]o distinction is to be drawn between" the business of water sales "when indulged by a municipality and when engaged in by a private corporation." *Ames*, 7 N.E.2d at 296. A business, of course, has no residents—its sales are sales. The same must be true of a municipality in the business of selling water; the character of its sales cannot be dependent on the residency of its customers. For that reason, the Court finds that the operation of the IPS is a proprietary function.

James, however, claims that for the municipal use exemption to apply, the proprietary function must be either owned or operated by Evanston. While Evanston claims that it operates the IPS, James emphasizes that he has alleged that "Evanston would not own or operate" the IPS. (Compl. ¶ 31.) He also notes that the Commission represented in its easement agreement with the MWRD that it would use the 2525 Church Street property to "construct, install, operate, maintain, repair, and remove a pump station." (*Id.* ¶ 41.) Thus, James asserts that the easement agreement establishes that it would be the Commission (not Evanston) that operates the IPS. Defendants respond by noting that James's complaint includes a contradictory allegation that "Evanston represented to residents and others on its web page that Evanston would operate the [IPS]." (*Id.*

¶ 42.) There are also facts from outside the complaint as to Evanston's operation of the IPS that Defendants ask the Court to consider in connection with the motions to dismiss. Specifically, Defendants direct the Court to the website referenced in the allegation, where Evanston provides a detailed overview of the IPS. Among other things, Evanston explains that the Commission "will handle construction and maintenance of the [IPS], but it will be operated by the City." *Water Pump Station Frequently Asked Questions*, City of Evanston, https://www.cityofevanston.org/government/departments/public-works/public-outreach/pump-station (last visited Mar. 22, 2021). Specifically, "[t]he pumps in the [IPS] will be remotely operated by the water plant operators at the Evanston Water Plant." *Id.*

The Court cannot reject at the pleading stage James's claim that Evanston does not operate the IPS. To the extent the Court can treat Evanston's website as either incorporated by reference into the complaint or subject to judicial notice,[3] the website shows, at most, that Evanston represented to the public that it would operate the IPS. But for the Court to accept that representation as true (and further as contradicting the complaint's allegation that Evanston did not operate the IPS), it would have to view the facts in the light most favorable to Defendants, which it cannot do in connection with a motion to dismiss. Instead, when viewing the allegations concerning Evanston's website in the light most favorable to James, they are consistent with his contention that Evanston made a false representation to the public. Whether Evanston's representation was, in fact, false is a question of fact to be decided later.

---

[3] Because James referenced Evanston's website in his complaint concerning its contents could be incorporated by reference. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment."). Alternatively, the Court could take judicial notice of Evanston's webpage. *See Goplin v. WeConnect, Inc.*, 893 F.3d 488, 491 (7th Cir. 2018) (finding that where a party refers to another party's website in its briefing, the district court may take judicial notice of the entire contents of that website); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (noting that government websites are judicially noticeable).

Nonetheless, even accepting as true James's allegation that Evanston does not operate the IPS, it is not entirely clear that the municipal exemption is inapplicable. Rather, it may be the case that treating the IPS itself as the proprietary function is viewing the term "proprietary function" too narrowly. Indeed, viewing the proprietary function at 2525 Church Street as simply pumping water overlooks that it is simply one of several components of the System, each of which serve the same, single purpose for which the System was constructed—to supply water to the Villages. (Compl. ¶¶ 8–9.) If the proprietary function is viewed broadly as the supplying of water to the Villages (*i.e.*, the System), it is apparent from the complaint that Evanston may have at least some operational role because Evanston supplies the water. (*See id.* ¶¶ 8, 41.) Yet James contends that even if Evanston operates a proprietary function—*i.e.*, fulfills the criteria in the first sentence of the exemption—that is not enough for the IPS to qualify for the exemption. Rather, the IPS must also meet the criteria set out in the ordinance's second sentence—it must also be housed in a building owned and operated by Evanston, be necessary for the provision of desired city services, and the adverse impact from noncompliance must be minimized.[4] In response, Defendants contend that the criteria found in the second sentence only regulate the building or structure, and here, James has failed to establish that the structure in which the IPS is housed is nonconforming.

Determining whether the IPS satisfied all applicable criteria for a municipal use exemption is a matter of statutory interpretation. "Under Illinois law, municipal ordinances are interpreted according to the traditional rules of statutory construction." *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 871 (7th Cir. 2009). "Illinois directs courts to ascertain and give effect to the intent of the enacting body, the clearest indicator of which is the language of the ordinance itself." *Id.* "Where the language of a statute is clear, the Court will not read into it

---

[4] The third and fourth sentences of the municipal use exemption are best understood as elaborating on the minimization of adverse impact from noncompliance criterion.

exceptions that the legislature did not express, and the Court will give the statute its effect as written." *Bethlehem Enters., Inc. v. City of Oak Forest*, No. 06 C 1772, 2007 WL 9706479, at *4 (N.D. Ill. July 20, 2007).

To begin, the Court finds that the alleged noncompliance at issue in James's complaint is the use of the 2525 Church Street property for water pumping. (*See, e.g.*, Compl. ¶ 25 ("The [IPS] would not qualify as either a permitted or special use in an Open Space district.").) The Zoning Code defines "use" to mean "[t]he purpose or activity for which the land, building or structure is designed, arranged, or intended, or for which it is occupied or maintained." Zoning Code § 6-18-3. Thus, the use concerns the activities occurring on the property. For example, in an Open Space district like 2525 Church Street, permitted uses include golf courses, parks, and playgrounds. *Id.* § 6-15-9-2.

The allowable uses for a zoning district are distinct from the regulations addressing the building and structures erected in the zoning district. In the Zoning Code's chapter addressing Open Space districts, there are two subsections concerning permitted and special uses and four subsections governing the buildings and structures' size, width, floor-area ratio, and height. *Compare id.* § 6-15-9-2–3, *with id.* § 6-15-9-4–7. Accordingly, the Zoning Code sets out separate processes for applying for a nonconforming use and for obtaining permission for a nonconforming building or structure. Thus, the unique use permit that James asserts Defendants should have obtained is meant to "allow a use which is determined by the City Council[] to be an unusual one-of-a-kind use that is not listed as an authorized special or permitted use within a particular zoning district." *Id.* § 6-3-7-1. By contrast, the variation process governs exemptions where the physical characteristics of the property deviate from the Zoning Code. *Id.* § 6-3-8-1, 3.

Recognizing the ways that the Zoning Code distinguishes between nonconforming uses and nonconforming buildings and structures bears on the proper understanding of the municipal use exemption. When considering the full context of the Zoning Code, there are two distinct regulations contained within the provision—one for uses and one for buildings and structures. While some uses may implicate both regulations, that will not always be the case. If a governmental or proprietary function is owned or operated by Evanston, it is a permitted use in any zoning district. Where that function does not require a building or structure or can be housed in a building or structure that complies with the requirements of the relevant zoning district, the use qualifies for the exemption and the inquiry is over. But if the function requires the construction of a building or structure that does not comply with the requirements of the zoning district, the City Council may only grant a municipal use exemption where the building or structure is owned and operated by Evanston, is necessary for the provision of City services, and the adverse impact on neighboring properties resulting from noncompliance is minimized. In short, the second sentence is only triggered where the use would be housed in a nonconforming building or structure.[5] That is the only reasonable interpretation of the ordinance.

By contrast, James's proposed interpretation is inconsistent with the Zoning Code's separate treatment of the uses of property and the physical characteristics of the buildings and structures erected on property. Moreover, under his interpretation, at least some portion of the first or second sentence would necessarily be rendered meaningless surplusage. *See Nielson v. Preap*, 139 S. Ct. 954, 969 (2019) ("[T]he interpretive canon against surplusage [expresses] the idea that

---

[5] Further supporting the Court's interpretation is the fact that later amendments to the Zoning Code resulted in the restructuring of the municipal use exemption. What used to be the first two sentences of the exemption are now separate subsections (A) and (B). Those subsections have also been reworded in a way that reinforces their distinctness. Thus, subsection (B) begins "Where the construction of buildings and structures owned or operated by the City do not comply with all of the requirements of the underlying district," thereby emphasizing that subsection (B) is only intended to apply in that specific circumstance.

every word and every provision is to be given effect and that none should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." (internal quotation marks omitted)).

Nowhere in James's complaint does he take issue with the building or structure in which the IPS is housed or otherwise make any allegations suggesting that it is noncompliant with the requirements of an Open Space district. Without any facts demonstrating that the structure housing the IPS was nonconforming, James cannot plead the inapplicability of the municipal use exemption by relying on the second sentence of the ordinance. Instead, under the unambiguous meaning of the municipal use exemption, the Court finds that the IPS would be a permitted use at 2525 Church Street so long as it is found to be a proprietary function operated by Evanston. However, the Court cannot definitively decide the issue at this stage because there remain too many factual issues concerning whether Evanston is, in fact, operating a proprietary function at 2525 Church Street. As discussed above, it is not clear whether the IPS or the System should be deemed to be the relevant proprietary function. If the former, then James's allegation that Evanston did not operate the IPS defeats any argument that Defendants have about the applicability of the municipal use exemption. If the latter, there remain issues of fact concerning Evanston's role in operating the IPS. For now, it suffices to say that the applicability of the municipal use exemption is at least debatable. Thus, Defendants cannot obtain dismissal of all the federal claims by arguing that the municipal use exemption plainly applies to the IPS. The Court therefore proceeds to address each of James's federal claims in turn.

### B. Section 1982

James contends that Defendants violated 42 U.S.C. § 1982 by improperly using the municipal use exemption to obtain approval for the construction of the IPS at 2525 Church Street.

Specifically, he claims that Defendants impaired his and the subclass members' property rights by bypassing proper zoning procedures to avoid giving adequate notice of the construction of the IPS to the predominantly African-American residents in the vicinity of 2525 Church Street when they would have been more transparent about their plan if the affected residents were white.

Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. The Supreme Court has construed the statute broadly and found that it protects "the right of black persons to hold and acquire property on an equal basis with white persons and the right of blacks not to have property interests impaired because of their race." *City of Memphis v. Greene*, 451 U.S. 100, 120 (1981). Thus, the Supreme Court has suggested that § 1982 "might be violated by official action that depreciated the value of property owned by black citizens." *Id.* at 123.

To state a § 1982 claim, a plaintiff must allege that "the defendant had a racial animus, intended to discriminate against the plaintiff, and deprived the plaintiff of protected rights because of the plaintiff's race." *Whisby-Myers v. Kiekenapp*, 293 F. Supp. 2d 845, 850 (N.D. Ill. 2003). Here, Defendants argue that James has not adequately alleged that Defendants deprived him and the members of the subclass of their protected property rights because of their race. In interpreting 42 U.S.C. § 1981—a provision "using nearly identical language" as § 1982—the Supreme Court has held that a plaintiff must "initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1016, 1019 (2020). It noted that its prior treatment of § 1982 supported its conclusion. *Id.* at 1016. Specifically, the Supreme Court stated that it had "repeatedly held that a claim arises under § 1982 when a citizen is not allowed to acquire property

*because of* color," and there was no reason to "demand less from a § 1981 plaintiff." *Id.* at 1016–17 (internal quotation marks and alteration omitted). And it further noted that the requirement that a plaintiff prove that the defendant's conduct was "because of" race was "often associated with but-for causation." *Id.* at 1016. Thus, because *Comcast* imposed a but-for causation requirement for § 1981 claims, it follows that a § 1982 plaintiff must also plead that his race was the but-for cause of the defendant's conduct. *See id.* at 1016–17.[6]

Under *Comcast*, the relevant question before the Court is whether James adequately alleges that but for his and the subclass members' race, Defendants would not have decided to pursue a municipal use exemption to locate the IPS at 2525 Church Street. The "but-for" causation standard is narrower than the "motivating factor" causation standard applicable to claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, which requires a plaintiff to show only that discrimination was a motivating factor in a defendant's challenged employment decision. *Comcast*, 140 S. Ct. at 1017; *see also Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1006 (7th Cir. 2005) ("A motivating factor is a factor that weighs in the defendant's decision to take the action complained of . . . . It is a, not necessarily the, reason he takes the action."). Under the but-for causation standard, it is not enough for a plaintiff to allege "that racial discrimination was one factor among many in a defendant's decision. Racial discrimination must be the determining factor." *Piccioli v. Plumbers Welfare Fund Loc. 130, U.A.*, No. 19-cv-00586, 2020 WL 6063065, at *6 (N.D. Ill. Oct. 14, 2020) (addressing § 1981 claim). That means James's allegations must allow the Court reasonably to infer that Defendants would have obtained a unique use permit for the IPS rather than a municipal use exemption had

---

[6] Even before the Supreme Court's *Comcast* decision, the Seventh Circuit interpreted both § 1981 and § 1982 to require a plaintiff to plead that racial prejudice was a but-for cause of the interference with property rights or refusal to transact. *Comcast*, 140 S. Ct. at 1014; *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 991 F.2d 1249, 1257 (7th Cir. 1993).

the affected residents been predominantly white. *See Bachman v. St. Monica's Congregation*, 902

F.2d 1259, 1262–63 (7th Cir. 1990) ("To be actionable, racial prejudice must be a but-for cause,

or in other words a necessary condition of the refusal to transact. Otherwise there is no harm from

the prejudice—the harm would have occurred anyway . . . ." (citations omitted)).

While James contends that his and the subclass members' race was the reason that

Defendants sought a municipal use exemption, his allegations point to the but-for cause of

Defendants' conduct being a desire to avoid public scrutiny. Indeed, James expressly alleges that

Defendants bypassed zoning procedures, in part, "to avoid public scrutiny." (Compl. ¶ 1.) Further,

he repeatedly claims or implies that the primary aim of Defendants' conduct was to deprive the

affected residents of notice and an opportunity to object to the construction of the IPS at 2525

Church Street. (*Id.* ¶¶ 22, 30, 44, 46, 60, 72.) Defendants' alleged motivation of securing approval

for the project with limited public scrutiny is an independent motivation capable of standing apart

from racially discriminatory animus. Of course, "[o]ften, events have multiple but-for causes" and

a defendant "cannot avoid liability just by citing some *other* factor" that played a role in its

conduct. *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020). And it certainly would be

possible to allege that Defendants sought to evade public scrutiny *because* of racially

discriminatory animus. But the allegations must support the connection—discriminatory animus

cannot be bootstrapped to another independent motivation.

There are two main allegations that James contends supports a plausible inference that

Defendants sought to deprive him and the subclass of the opportunity to scrutinize the IPS project

because of their race. First, there is the fact that the residents residing closest to 2525 Church

Street were predominantly African-American. However, "disparate impact alone is almost always

insufficient to prove discriminatory purpose." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th

Cir. 2017). Thus, James points to his allegations concerning how the Commission applied for a special use permit and adhered to all the associated notice procedures when it sought to locate the IPS in a predominantly white neighborhood in Skokie. But the Commission's conduct with respect to the abandoned Skokie plans did not involve Evanston and says nothing of Evanston's intent. Moreover, that the Commission initially sought to locate the IPS in a predominantly white neighborhood suggests that the Commission was not targeting only African-American neighborhoods as potential sites.[7] Notably, James does not allege that the Commission knew or should have known the demographic composition of the residents living near either the proposed Skokie site or 2525 Church Street.

In any case, as pleaded, the different approach the Commission took in Skokie reveals little with respect to the approach it ultimately took in Evanston because the white residents in Skokie were not similarly situated to James and the subclass members. "A person is similarly situated to the plaintiff if the person is 'comparable to the plaintiff in all material respects.'" *Webb v. Budz*, 480 F. Supp. 2d 1050, 1057 (N.D. Ill. 2007) (quoting *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006)). The analysis requires a court to determine whether there are "enough common features between the individuals to allow a meaningful comparison." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). Here, the obvious difference between the white Skokie residents, on the one hand, and James and the subclass members, on the other hand, is that they reside in different municipalities with each municipality subject to its own zoning code. Indeed, the complaint makes clear that there are differences between the zoning codes, as James alleges that the IPS would require a special use

---

[7] The Commission also briefly considered another Evanston location before deciding on 2525 Church Street, but James makes no allegation regarding the demographic makeup of the residents near that site. (*See* Compl. ¶ 18.)

permit if built in Skokie whereas he claims that it would require a unique use permit in Evanston. (Compl. ¶¶ 13, 26.) Further, it is evident that the notice procedures associated with applying for the relevant use in each municipality vary. (*Id.* ¶¶ 14, 26–29.) Finally, James does not allege that Skokie has a municipal use exemption or some comparable exemption.

Even if Skokie had a municipal use exemption available to the Commission on terms comparable to the one in Evanston, the two municipalities were also differently situated with respect to the IPS. Although the Court accepts as true at this stage that Evanston did not operate the IPS, Evanston was not entirely a stranger to the project because it was the supplier of the water that the IPS was constructed to pump. As discussed above, Evanston's relationship to the System at least gave it a colorable argument that the IPS was a proprietary function under the municipal use exemption. On the other hand, James's complaint reveals no role for Skokie in the System. Consequently, Skokie would not have the same argument as Evanston—if any—for the applicability of the municipal use exemption. Given these material differences between Skokie and Evanston, the Court cannot reasonably infer from the allegations that race was the key factor underlying the Commission's contrasting procedural choices. *See Coleman v. Donahue*, 667 F.3d 835, 846 (7th Cir. 2012) ("[The similarly situated requirement's] purpose is to eliminate other possible explanatory variables . . . which helps isolate the critical independent variable— discriminatory animus." (internal quotation marks omitted)).

As for Evanston, James claims that procedural irregularities leading to the approval of the IPS at 2525 Church Street support a reasonable inference that race was the reason why Evanston acted as it did. The Supreme Court has identified "[d]epartures from the normal procedural sequence" as one type of evidence that could show that an improper discriminatory purpose played a role in official action. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429

U.S. 252, 266 (1977). The primary allegation supporting the existence of a departure from the normal procedural sequence is that Evanston recommended that the Commission seek a municipal exemption and ultimately approved it. James claims that using this exemption was a departure from the normal procedural sequence, but he fails to allege how Evanston previously proceeded differently in comparable circumstances. James also cites misrepresentations Evanston allegedly made in connection with the process for seeking approval of the project. Of those alleged misrepresentations, only one was actually made to the general public and that misrepresentation came after the Evanston City Council approved construction of the IPS at 2525 Church Street. (Compl. ¶¶ 24, 33, 41–42.) At bottom, the allegations that supposedly reveal Evanston's racially discriminatory purpose only would show that Evanston sought to fast-track the approval process for the IPS with minimal public scrutiny. Again, such allegations do not suffice to connect Evanston's lack of transparency to the affected residents' race.

In sum, James has failed to allege adequately that his and the subclass members' race was the but-for cause of Defendants' decision to seek a municipal use exemption to construct the IPS at 2525 Church Street. For that reason, his § 1982 claim is dismissed.

### C. Conspiracy to Deny Equal Protection Rights

James asserts that, by agreeing to pursue a municipal use exemption for the IPS, Defendants entered into a conspiracy to deprive him and the class members of the equal protection of the laws in violation of 42 U.S.C. § 1985(3). To state a civil conspiracy claim under § 1985(3), a plaintiff must allege "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir. 1999).

A viable § 1985(3) claim requires a plaintiff to "plead specific material facts that show the existence of the agreement" and "that, in entering the agreement, Defendants intended to discriminate against Plaintiffs and deprive them of their constitutional rights *because of* Plaintiffs' race." *Linda Constr. Inc. v. City of Chicago*, No. 15 C 8714, 2016 WL 4429893, at *3 (N.D. Ill. Aug. 22, 2016) (citing *Winterland Concessions Co. v. Trela*, 735 F.2d 257, 262 (7th Cir. 1984) and *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1983)). Thus, the Court's conclusion above that James has not adequately pleaded that race was a determinative reason for Defendants' conduct applies equally here. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275–76 (1993) ("[T]he 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it.").

Furthermore, James has not sufficiently pleaded the existence of a conspiracy. "In order to establish the existence of a conspiracy, . . . a plaintiff must demonstrate that the conspirators have an agreement to inflict injury or harm upon him." *Hernandez*, 197 F.3d at 263. The allegations must demonstrate that the conspirators acted "with a single plan, the general nature and scope of which is known to each would-be conspirator." *Id.* James's complaint contains only limited allegations concerning any direct communications between the Commission and Evanston. Specifically, he alleges that the two had discussions regarding the construction of the IPS in late January 2018 that led to an agreement that the Commission would apply for a municipal use exemption. (Compl. ¶¶ 23, 30.) At most, if proved, these allegations would show that there was an agreement between the Commission and Evanston to obtain approval for the project by way of the municipal use exemption. But it would not support a finding that the two chose that route based

on a shared common objective of depriving James and the class of their right to equal protection of the laws.

Thus, James's civil conspiracy claim fails for two reasons: first, he fails to allege adequately that Defendants acted with a single plan known to both Evanston and the Commission; and second, he has not pleaded adequately that Defendants sought to deprive him and members of the class of their equal protection rights because of their race. Therefore, James's § 1985(3) claim is dismissed.

### D.      Procedural Due Process

Even setting aside the race of the residents affected, James claims that Evanston still violated his and the class members' rights to procedural due process under the Fourteenth Amendment to the Constitution. To find a valid procedural due process claim, a court must first "determine whether the plaintiff was deprived of a protected interest" and, if so, it then "must determine what process is due." *Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004). James's claim centers on Evanston's alleged failure to give the residents living near 2525 Church Street sufficient notice and an opportunity to challenge the construction of the IPS at 2525 Church Street. As a result of the construction of the IPS, James claims that he and the members of the proposed class were deprived of their interest in the value of their properties.

Seeking dismissal, Evanston first contends that James does not have a protected property interest in the value of his property. Property interests are not created by the Constitution but instead "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Neither Evanston nor James points to any controlling authority addressing whether property value is among the interests protected by procedural due process. Undoubtedly,

an owner of real property has a protected interest in that property. What is less clear is whether a property owner has a protected property interest in the intangible economic value of his property.

At least one Illinois court has found that a property's value is not itself a protected property interest. *Groenings v. City of St. Charles*, 574 N.E.2d 1316, 1324 (Ill. App. Ct. 1991) (characterizing property owners' interest in increasing the value of their land "as an entitlement rather than an expectancy"); *see also Residences at Riverbend Condo. Ass'n v. City of Chicago*, 5 F. Supp. 3d 982, 988 (N.D. Ill. 2013) ("Illinois courts do not recognize property values . . . as constitutionally protected property interests." (citing *Groenings*, 574 N.E.2d at 1324)). Many other courts have found that procedural due process does not protect against official action that causes a reduction in value to property, absent a taking or near total loss of value. *E.g.*, *BAM Historic Dist. Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983); *Trotta v. Borough of Bogota*, No. 12-cv-2654 (KM)(MAH), 2016 WL 3265689, at *8 (D.N.J. June 6, 2016). Furthermore, the Seventh Circuit has strongly suggested that a property owner is not entitled to due process with respect to action not directed at his property. *See Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 423 (7th Cir. 2010) (holding that a property owner "does not have a property interest in the lifting of zoning restrictions on another's property"); *see also Tri-State Disposal, Inc. v. Village of Riverdale*, 369 F. Supp. 3d 866, 876 (N.D. Ill. 2019) ("[The plaintiff] fails to plead how its ownership of property entitles it to due process with respect to action not directed at that property."). Viewing these authorities together, this Court concludes that James cannot state a procedural due process claim based on Evanston's grant of a municipal use exemption to allow the IPS to be built on an adjacent property even though that action may have harmed the value of his property.

Even if there were a protected property interest in property values, "the procedures 'due' in zoning cases are minimal." *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166 (7th Cir. 1994). And where, as here, "zoning decisions are confided to a legislative rather than a judicial body . . . the affected persons have no right to notice and an opportunity for a hearing: no right, in other words, to procedural due process." *Ind. Land Co. v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004). Thus, the Seventh Circuit's precedents "establish difficult terrain for a procedural due process claim to proceed" in the zoning context. *Pittsfield Dev., LLC v. City of Chicago*, No. 17 C 1951, 2017 WL 5891223, at *9 (N.D. Ill. Nov. 28, 2017). Here, the notice and opportunity to be heard provided by Evanston was limited but not non-existent. For example, the Fifth Ward's Alderman's newsletter included an agenda for a meeting that included as a topic for discussion "Niles Morton Grove Water Pumping Station Proposals." (Compl. ¶ 22.) Further, the proposal to locate the IPS at 2525 Church Street was addressed at two public City Council committee meetings followed by a meeting of the full City Council. Given the minimal process due for zoning decisions, the Court finds that Evanston provided sufficient process.

In short, the Court finds that the allegations of the complaint fail to establish a protected property interest. And in any case, Evanston provided constitutionally sufficient notice and opportunity to be heard. Consequently, James has failed to state a procedural due process claim.

### E.    Substantive Due Process

Finally, James asserts a claim for violation of his right to substantive due process against Evanston. Like a procedural due process claim, a substantive due process claim requires that a plaintiff plead an "[i]ntrusion upon a cognizable property interest." *Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1002 (7th Cir. 2008). Thus, the Court's conclusion above that James

failed to plead a protected property interest is fatal to his substantive due process claim. *Id.* Nonetheless, James's substantive due process claim fails even assuming a property interest.

"A government entity must have exercised its power without reasonable justification in a manner that shocks the conscience in order for a plaintiff to recover on substantive due process grounds." *Bettendorf v. St. Croix County*, 631 F.3d 421, 426 (7th Cir. 2011) (internal quotation marks omitted). Substantive due process does not afford "a blanket protection against unjustifiable interferences with property . . . . [a]nd it does not confer on federal courts a license to act as zoning boards of appeal." *Gen. Auto Serv. Station*, 526 F.3d at 1000 (internal quotation marks and citations omitted). "Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate governmental interest, or alternatively phrased, that the practice be neither arbitrary or irrational." *Id.* (internal quotation marks omitted).

James argues that his substantive due process claim implicates his fundamental right to equal protection of the laws.[8] To state an equal protection claim, James must adequately allege that Evanston acted with a racially discriminatory purpose. *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). A discriminatory purpose means that "the decisionmaker. . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Because this Court has already found that James has failed to allege a discriminatory

---

[8] The Court assumes for present purposes that a substantive due process claim can be predicated on a violation of the right to equal protection. However, generally, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive of substantive due process must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994).

purpose on the part of Evanston, he cannot maintain a substantive due process claim predicated on an equal protection violation.

Having failed to plead a violation of a fundamental right, James must demonstrate that Evanston's zoning decision was either arbitrary or irrational. James does not attempt to challenge Evanston's decision to place the IPS at 2525 Church Street as not rationally related to a legitimate government interest. And indeed, Evanston's approval of land within its city limits for the placement of the IPS was rationally related to its legitimate interest, especially since Evanston stood to benefit financially as the supplier of the water being pumped by the IPS. Instead, James argues that it was irrational for Evanston to approve a municipal use exemption for the IPS since it knew that the exemption was facially inapplicable. But a municipality's alleged misinterpretation of its own ordinance does not, by itself, implicate substantive due process. *See Tucker v. City of Chicago*, 907 F.3d 487, 494 (7th Cir. 2018); *CIMA Devs. Ltd. P'ship v. City of West Chicago*, No. 19 C 2193, 2021 WL 736224, at *2 (N.D. Ill. Feb. 25, 2021). James's substantive due process claim is therefore dismissed.

### III. State-Law Claim

James's complaint also asserts a state-law claim for violation of the Illinois Civil Rights Act, 740 ILCS 23/5. Having dismissed the federal claims over which the Court had original jurisdiction, it is within this Court's discretion to decline to exercise supplemental jurisdiction over this remaining state-law claim. *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012).

Where a federal district court dismisses all claims under its original jurisdiction before trial, "the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Id.* "The presumption is rebuttable, but it should not be lightly abandoned, as it

is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Id.* The Seventh Circuit has identified certain circumstances that can rebut the presumption, including:

> (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Id.* at 480. Here, James has failed to show that any of these circumstances are applicable. For that reason, the Court relinquishes jurisdiction over his state-law claim.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss (Dkt. Nos. 22, 23) are granted and James's complaint is dismissed without prejudice. Accordingly, Defendants' joint motion to strike (Dkt. No. 20) is denied as moot. Defendants argue that the dismissal should be with prejudice, the Court disagrees. A plaintiff "whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try and amend [his] complaint before the entire action is dismissed." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 941 (7th Cir. 2018). Because the Court cannot conclude that granting James leave to amend would be futile, the federal claims are dismissed without prejudice.

ENTERED:

Dated:  September 29, 2021

_____
Andrea R. Wood
United States District Judge